O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

SAVANNA VIOLET ARRUDA by
her Guardian ad Litem LIDIA
SILVA ARRUDA, JOYCE ANN
ARRUDA, RICARDO ARRUDA,
and LISA MARIE DUMONT,

             Plaintiffs,

    v.

COUNTY OF LOS ANGELES,
LOS ANGELES COUNTY Sheriff's
Department, and DEPUTY RYAN
ANGULO,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. EDCV06-00555-SGL (OPx)

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT;
ORDER DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT

    A Los Angeles County sheriff's deputy, Michael Arruda, was shot and killed by a fellow deputy during a confrontation with a suspect outside an apartment.  The family of Deputy Arruda has now brought a section 1983 civil rights claim against the shooting officer and the county, arguing that his constitutional right to be free from unreasonable seizure (namely, the shooting) and to substantive due process were violated through his fellow officer's application of force.[1]

    The central question presented in defendants' motion for summary judgment is whether the officer intentionally shot Deputy Arruda believing him to be the suspect or

---

    [1]  They have also brought a dependent <u>Monell</u> claim against the county.

whether the officer shot at the suspect but the bullet went awry and struck Deputy Arruda instead. If the latter, plaintiffs agree that there is no constitutional violation. Resolution of this question turns on the evidence submitted. Before delving into that evidence, however, an exposition on the law that applies is in order.

The Fourth Amendment prohibits governmental actors from engaging in the "unreasonable search and seizure" of others and/or their property. For there to be a Fourth Amendment "seizure," the governmental actor must have intended to restrict the person's freedom of movement. "The Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." Brower v. County of Inyo, 489 U.S. 593, 596 (1989). The person against whom the force was applied must have been the "object of [the] detention or taking" or no Fourth Amendment seizure occurs. Id. at 596. Thus understood there is a distinction between an act directed toward someone that produces a particular result (which would amount to a Fourth Amendment "seizure") and an act that simply causes a particular result that was not sought. In order for there to be a "seizure" within the meaning of the Fourth Amendment, there must be an act by the governmental actor with the intention of seizing the particular object or individual at issue. Accidental or unintended seizures caused, but not sought, will not suffice. The Supreme Court in Brower gave the following illustration of this distinction: "[I]f a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment." Id. Conversely, a seizure occurs when officers mistakenly arrest one person thinking he was someone else because the person's detention was intended even though the object of it was not. See Hill v. California, 401 U.S. 797, 802-05 (1971). The distinguishing characteristic between these two situations concerns whether the force in question was directed at the specific individual who was struck.

Thus, in United States v. Lockett, 919 F.2d 585, 590 n.4 (9th Cir. 1990), the Ninth Circuit held that an innocent bystander struck by a stray bullet from an officer's weapon would not be considered "seized" for purposes of the Fourth Amendment. This line of

reasoning is found in a long line of cases all involving unintended individuals as the subject

of the act of force (be it as a hostage or an innocent bystander), as opposed to those who

were intended to be seized by the act in question but who were later found to have been

mistaken in doing so (as the case would be with mistaking someone as a suspect and then

applying force upon that mistaken belief).  See Landol-Rivera v. Cruz Cosme, 906 F.2d

791, 795 (1st Cir. 1990) (no Fourth Amendment seizure because passenger in suspect's

car was not the object of the police bullet that hit him, officer was shooting toward suspect

but bullet accidentally struck passenger; "it is intervention directed at a specific individual

that furnishes the basis for a Fourth Amendment claim"); Medeiros v. O'Connell, 150 F.3d

164, 168 (2nd Cir. 1998) (holding that for there to be a Fourth Amendment seizure the

"claimant [must be] the intended object of the officers' restraint or use of force"); Rucker v.

Harford County, 946 F.2d 278, 281 (4th Cir. 1991) ("[O]ne is "seized" within the fourth

amendment's meaning only when one is the intended object of a physical restraint by an

agent of the state.  This means that a fourth amendment seizure may occur

notwithstanding that the person restrained was mistakenly thought to be another, because

he nevertheless is the intended object of the specific act of physical restraint.  But it does

not mean, as Rucker contends, that a seizure occurs just so long as the act of restraint

itself is intended (here the act of shooting) though it restrains one not intended to be

restrained"); Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir. 2000) (the Fourth

Amendment . . . does not apply to section 1983 claims which seek remuneration for

physical injuries inadvertently inflicted upon an innocent third party by police officers' use

of force while attempting to seize a perpetrator, because the authorities could not 'seize'

any person other than [the] one who was a deliberate object of their exertion of force"

(emphasis in original)); Childress v. City of Arapacho, 210 F.3d 1154, 1156-57 (10th Cir.

2000)(same).  On the other hand, a seizure would occur where the shooter intentionally

shot his gun at the target who was struck by the bullet mistakenly believing the target to be

a suspect.  See Jensen v. City of Oxnard, 145 F.3d 1078 (9th Cir. 1998) (finding seizure

where it was undisputed that "in the turmoil of events, [the officer] mistook [his fellow

officer] for a gun-wielding occupant of the premises and shot him to death"); see also Cruz
Cosme, 906 F.2d at 796 ("when officers mistakenly shoot an innocent victim thinking that
he is the suspect they are pursuing, the seizure was intended even though the target was
not" (emphasis added)); Medeiros, 150 F.3d at 169 (noting the distinction that exists from
cases "in which the police shoot an innocent victim mistakenly believing that he is the
suspect whom they are pursuing; in such cases, the victim was indeed the object of an
intentional act of seizure, even if the police were mistaken as to the victim's identity").

Thus, the legal question presented is whether there is any evidence indicating that,
when his fellow officer shot Deputy Arruda, he did so intending to strike Deputy Arruda (for
whatever reason, such as mistakenly believing him to be the suspect), or whether he was
trying to strike someone else and the bullet accidentally hit Deputy Arruda.  This is, of
course, a fact-intensive question predicated in large measure (from plaintiffs' perspective)
on circumstantial evidence (given Deputy Arruda's death and the other deputy's not
unexpected testimony that he was not trying to shoot Deputy Arruda).  See Scott v.
Heinrich, 39 F.3d 912, 916 (9th Cir. 1994) ("Deadly force cases pose a particularly difficult
problem . . . because the officer defendant is often the only surviving eyewitness. . . .  The
court may not simply accept what may be a self-serving account by the police officer.  It
must also look at the circumstantial evidence that, if believed, would tend to discredit the
police officer's story").  It is to these facts that the Court now turns.

At almost 10:00 p.m. on June 9, 2004, Los Angeles County sheriff's deputies Ryan
Angulo, Michael Arruda, Grayson Klein, and Ken Mort responded to a call of shots fired at
a Motel 6 in Hacienda Heights, California.  Upon their arrival the deputies were directed to
apartment room 219 on the motel's second floor where it was reported to them that a
suspect had been shooting a pellet gun.  A graphic depiction of the physical layout of both
the apartment, the outdoor walkway, and at least one version of the individuals' respective
positions (as later constructed by the Sheriff's Department) is attached to the Court's
Order.

4

As the deputies lined up one in front of the other (which most but not all witnesses place in the order of Mort, then Arruda, then Angulo, and finally Klein) on the left side of the door to apartment 219 , Deputy Mort, who stood closest to the door, knocked on the door announcing: "Sheriff's Department. Open the door." At that point the apartment door was suddenly flung open by the suspect, who began shooting at the deputies. By all accounts, the suspect stood and remained planted inside the apartment with his arm holding the weapon extended across the door's threshold.

Deputies Angulo, Mort, and Arruda thereafter shot at the suspect, or more precisely at the suspect's hand exposed through the apartment doorway that was holding the weapon. During the exchange of fire, lasting only a matter of seconds, Deputy Arruda and the suspect were both struck by bullets and both later died of their wounds. It was later determined that the suspect was shooting a pellet gun and that Deputy Arruda was killed by a bullet shot from another officer's service weapon. How exactly Deputy Arruda was shot is the subject of some dispute by the parties.

Plaintiffs' evidence on this point is largely constructed of third-party eyewitness statements and forensic evidence, notably the bullet trajectory from the fatal shot.

Patricia Acevedo recounted what she saw while watching the video feed from the hotel's security camera. Ms. Acevedo stated in her deposition that four deputies approached the door to room 219 with their guns "holstered," the one nearest the door tapped on it and then the door was suddenly flung open by the person inside the apartment. At that point, Ms. Acevedo heard shots coming from inside the apartment (presumably from the suspect) and in reaction the deputies "reached for their guns."

At the same time Ms. Acevedo states that several things occurred simultaneously amongst the deputies themselves. The deputy closest to the door (which by all accounts was Deputy Mort) was "pushed from behind by the deputy nearest him" toward "the direction of the doorway" and fell to the ground "just across the threshold." The deputy who pushed Deputy Mort then either fell "on top of" or hovered over Deputy Mort. Meanwhile, the third deputy from the door stepped toward the apartment's entrance, when

5

the fourth deputy back from the door began firing and struck the third deputy. Ms. Acevedo's deposition testimony becomes a bit confused at this point. According to her, the third deputy's position vis-a-vis the apartment door was much different than either the officers or the other third-party eyewitness' stories relate. At the time Deputy Arruda was shot there were three deputies stacked up at the apartment door's threshold: Deputy Mort was laying on the ground across the threshold, Deputy Kline was either lying on top of him or standing over him, and Deputy Arruda was standing right behind the two deputies. In other words, the deputies were piled up against one another at the doorway when Deputy Angulo fired the fatal shot. Ms. Acevedo explained what happened as follows: "[Deputy #2] is pushing the first deputy, and [deputy #] three is getting his gun, and [deputy #] four is shooting when [deputy #] three is now bobbling himself, like he got hit. I don't know if he got hit from the front. Actually, it looks like he got hit from the back." These series of events occurred so quickly that Ms. Acevedo described it as "the last gentleman [from the back] fires, and then . . . everybody in front of him just fall like Dominos."

Another third party eyewitness, Christina Spicer, relayed a slightly different account of what happened in front of the apartment door. She stated that there were three deputies, not four, who approached the apartment door. The deputy closest to the apartment door knocked on it, the door then swung open, and a exchange of gun fire ensued. As the shooting began, the officer standing behind Deputy Mort then stepped forward and moved to the left toward the balcony railing. In other words, this "middle deputy" moved into the line of fire between the suspect and the third deputy, the one that was the furthest back from the door, exposing the left side of their body to the other deputies' gunfire. This "middle deputy" was the one that was shot by the third deputy.

A third version is presented by Deputy Angulo's deposition testimony. Deputy Angulo placed himself at the back of the group of four deputies, putting Deputy Arruda as immediately in front and to the left of him; stated that the suspect remained at all times in the apartment (with, at most, the suspect's hand and gun appearing across the apartment door threshold); and further stated that Deputy Arruda moved near the apartment doorway

6

(but still in the outdoor exposed walkway and still standing behind the other two deputies in front of him) when he was struck by a bullet.  Asked whether Deputy Arruda was ever in his field of fire as he shot toward the suspect, Deputy Angulo responded that he "never saw [Deputy Arruda] in [his] field" of fire, but that he "doesn't know" whether in fact Deputy Arruda ever did pass in front of him.  In contrast to the deposition account, Deputy Angulo stated in his initial interview with sheriff's department investigators that Deputy Klein was standing to the rear of the group and that Deputy Arruda spun around or turned back towards him before being shot.

Deputy Mort basically reiterated Deputy Angulo's version of events, including the lineup of the four deputies and Deputy Arruda's movement of turning toward the door (from his initial position near the balcony railing) "in a clockwise manner" when he was struck by a bullet.

The last deputy present that evening gave an account that more or less corroborated the one relayed by Deputy Angulo, but in some respects corroborates Ms. Spicer's version that only three (not four) deputies were actively involved in the confrontation.  Deputy Kline stated during his deposition that he was the one who was standing furthest away from the apartment door, that Deputy Angulo was standing a couple of feet behind and to the left of Deputy Mort (who was standing closest to the door), and that Deputy Arruda was standing more or less parallel to (or slightly in front of) Deputy Mort next to the balcony railing.  After the apartment door opened, Deputy Kline saw the suspect holding what appeared to be a black gun in his hand with his arm extended, approaching the apartment door threshold, and firing off his weapon three times.  During the resulting exchange of gunfire, Deputy Kline stated that Deputy Angulo and Deputy Mort closed ranks, thereby obstructing his view of the door.  Deputy Kline did, however, spy Deputy Arruda rotate or turn his body around and attempt to move away from the confrontation toward his (Klein's) direction.  When the shooting stopped he saw Deputy Arruda lying on the ground on the outdoor walkway.  Deputy Kline then stated that, after the shooting incident, Deputy Angulo offered him an explanation as to how Deputy Arruda

7

1   was shot as he essentially stepped into his line of fire with the suspect: "He believed that

2   [Deputy Arruda] was either turning away or --- or addressing the guy and [Deputy Angulo]

3   was engaging the guy and, you know, the way [Deputy Angulo] thought that [Deputy

4   Arruda] --- [Deputy Arruda] may have went to retreat or --- or shot and moved and jumped

5   in front of his gun."

6         The final piece of evidence is forensic evidence concerning the trajectory and the

7   placement of the corresponding entry and exit wounds caused by the bullet that struck and

8   killed Deputy Arruda.  Plaintiffs emphasize that the bullet trajectory was in a downward

9   angle moving left to right entering Deputy Arruda's body just under his left ear, passing

10  through his neck, and exiting out his lower right jaw.  From this, plaintiffs argue that Deputy

11  Arruda must have been both near the ground (given the downward nature of the bullet's

12  trajectory) with his back turned to the apartment door (given that the bullet entered his left

13  side of the body and the deputies approached the apartment from the left) at the time he

14  was shot, something that is consistent with Ms. Spicer's eyewitness account concerning

15  the "middle deputy" standing directly behind the deputy knocking on the apartment door

16  who then moved from that position in a diagonal line toward the balcony railing when he is

17  struck by a bullet.

18        Such a bullet trajectory could also be explained by the deputies and Ms. Acevedo's

19  version placing Deputy Arruda near the balcony when the shooting starts.  All three

20  witnesses agree that Deputy Arruda moved from his position near the balcony railing

21  during the exchange of gun fire.  At least three witnesses (Deputies Mort, Kline and

22  Angulo) also state that Deputy Arruda spun away from the door back toward the other

23  deputies behind him when he was struck by the bullet.  This twisting of his torso could

24  have exposed Deputy Arruda's left side of his body to the fatal bullet.

25        Regardless, in each instance (Ms. Acevedo's and the others), it appears that

26  Deputy Arruda stepped, fell, or in some manner moved himself into the line of fire between

27  the suspect and Deputy Angulo.  Indeed, during oral argument, plaintiffs' counsel

28  hypothesized that as being the plaintiffs' theory of the case.  This acknowledgment

undercuts plaintiffs' argument that Deputy Angulo was trying to shoot Deputy Arruda by mistaking him for the suspect. An unstated assumption in the "moving into line of fire" proposition is that the deputy who did the shooting was aiming at the suspect when the other deputy jumps, falls, or otherwise moves unexpectedly into the way and is therefore accidentally struck by a bullet intended for the suspect.

Moreover, whichever version of events is accepted does not change the fact that there is another problem with plaintiffs' evidence: None of it places Deputy Arruda in a position where a jury could reasonably infer that Deputy Angulo could have mistaken him for the suspect and that, therefore, Deputy Angelo was actually trying to shoot Deputy Arruda (not knowingly, but intentionally). Even with all the twisting and contorting of testimony and forensic evidence, the fact remains that Deputy Arruda was located on the exposed walkway outside the apartment, and the suspect was inside the apartment when he was shot. There is no evidence indicating that Deputy Arruda was standing inside the apartment when he was shot.

There must be some evidence to present to a jury from which they could justifiably infer the possibility that Deputy Arruda was mistaken for the suspect. See United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1545 (9th Cir. 1989) ("A court evaluating a summary judgment motion must consider all 'justifiable' and 'legitimate' inferences in the non moving party's favor"). Such a justifiable inference need not be the most persuasive inference that can be drawn from the evidence, but it must be a rational one. Id. at 1542. Although the accounts diverge about Deputy Arruda's position when he was shot, none of these disputed facts raise any inference that he was shot because the shooter believed him to be the suspect or otherwise was intending to shoot him.

Toward that end, a little-noted point by either side in this case is that it is undisputed that all of the deputies that evening were in their uniforms. This further detracts from the notion that the shooter specifically intended to shoot Deputy Arruda, someone wearing a police officer uniform, mistaking him to be a suspect. Furthermore, Deputy Angulo's undisputed testimony is that he shot toward the entryway into the apartment and was not

aiming at anyone standing on the exposed outdoor walkway.  Without some evidence placing Deputy Arruda in position where he <u>could</u> be confused for the suspect, the only remaining explanation for his shooting is that it was an accident, with the bullet directed at the real suspect but somehow errantly striking Deputy Arruda.

That is the <u>only</u> evidence submitted by plaintiffs.  Variations on the line up of the deputies outside the door to room 219, variations on whether Deputy Arruda was falling or tripped into the line of fire or had his face turned toward the deputy who shot him do not provide any support for the contention that Deputy Arruda was the intended object of the shooting.  No evidence has been submitted that would give rise to the possible inference of Deputy Arruda being confused with the suspect himself.  Even under Ms. Acevedo's version of events, Deputy Arruda was located <u>outside</u> the door to the apartment, standing <u>behind</u> other deputies who were themselves sprawled across the door's threshold.  Without such evidence, there is absolutely no basis upon which one could conclude that his shooting was intentional.  As well-stated by the defense: "None of these theories have any relevance to support an intentional shooting . . . .  Plaintiffs now cannot even identify who intentionally shot Deputy Arruda, yet still hypothesize 'whomever shot Arruda did so intentionally.' . . . .  Plaintiffs' irrelevant theories do not call into question Deputy Arruda's intentions or state of mind."  (Defs' Reply at 2).

In short, there is no evidence that the shooting of Deputy Arruda was the direct object of police intervention.  Deputy Arruda was not the object of the police bullet that struck him; rather, all of the evidence points to the fact that the suspect was the object of the bullet that accidentally struck Deputy Arruda instead.  With no Fourth Amendment claim, there can be no <u>Monell</u> claim.

This finding also undercuts plaintiffs' substantive due process claim, as an accidental shooting, especially one under the circumstances such as those in this case, conducted within tight quarters among deputies confronting a suspect firing at them with what appeared to be a gun, would not be shocking to the conscience.  <u>See</u> <u>County of Sacremento v. Lewis</u>, 523 U.S. 833, 849 (1998) (noting conduct "most likely to rise to the

conscience shocking level" is that where someone "intended to injure in some way, unjustified by any governmental interest").

Moreover, the tense and rapidly developing nature of the situation the officers faced when Deputy Arruda was shot and killed, coupled with the corresponding split-second judgments that had to be made that tragically resulted in Deputy Arruda's death, further undercut any claim for a violation of substantive due process.  A partially obscured suspect had just flung open the door to an apartment, drew what appeared to be a weapon, and began shooting at the deputies, who were all grouped together in close quarters.  Deputy Angulo's -- or any other deputy's -- decision to shoot in the direction of the suspect was not an arbitrary act vis-a-vis the rights of the other deputies.

Perhaps Deputy Angulo could have taken more time before firing each shot to make sure that one of his compatriots did not fall or trip into his line of fire, but such negligence (predicated in large measure on second-guessing a deputy's judgment in a situation where he must act "in haste, under pressure, and frequently without the luxury of a second chance," see Whitley v. Albers, 475 U.S. 312, 320 (1986)) is not enough to establish a due process claim. See Cruz Cosme, 906 F.2d at 796-97 (holding no substantive due process violation from police officer's accidental shooting of a hostage; "it is inevitable that the police response to violent crime will at times create some risk of injury to others, including innocent bystanders.  We decline to hold that the mere presence of risk reflects a callous indifference to the constitutional rights of those individuals potentially harmed"); Medeiros, 150 F.3d at 170 (noting that "where the officer's instinct was to do his job as a law enforcement officer, not to induce lawlessness, or to terrorize, cause harm, or kill, the officer's conduct did not shock the conscience").

Finally, plaintiffs also seek to amend their complaint to argue that perhaps one of the other two deputies present that night was responsible for Deputy Arruda's shooting. However, given that none of the evidence puts Deputy Arruda in such a position from which it could be inferred that, whichever deputy shot him, he did so thinking that Deputy Arruda was the suspect, such an amendment would be futile as it would suffer from the

11

same legal defect as plaintiffs' present complaint against Deputy Angulo.  Again, the problem for plaintiff is that <u>none</u> of the physical evidence or testimony places Deputy Arruda in a position from which it can be justifiably inferred that whoever shot him did so trying to shot him rather than trying to shot the suspect but accidentally shooting Deputy Arruda instead.  Deputy Arruda, as established by all the evidence submitted, was standing or crouching on the walkway outside the apartment; meanwhile, the suspect, again under all the evidence, was standing inside the apartment near the apartment door way's threshold.  This mismatched juxtaposition of the shooting victim and the suspect forecloses the possibility that the deputy who shot and killed Deputy Arruda did so mistakenly believing he was the suspect.  Absent the intentional acquisition of control over Deputy Arruda, there can be no Fourth Amendment seizure nor can the accidental nature of the shooting rise to the level of a substantive due process violation (accidents do not "shock the conscience").

Accordingly, the Court **GRANTS** the motion for summary judgment and **DENIES** the motion for leave to amend the complaint.

Within 7 days of the issuance of this order, the defendants are to submit to the Court and serve on plaintiff's counsel, a proposed final judgment.

IT IS SO ORDERED.

Dated:  August 5, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

12

